# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

MAJORIE J. STOUT,

        Plaintiff,

vs.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

        Defendant.

No. C14-3037-LTS

**MEMORANDUM
OPINION AND ORDER**

_____

Plaintiff Marjorie J. Stout seeks judicial review of a final decision of the Commissioner of Social Security (Commissioner) denying her application for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* (Act). Stout argues that the administrative record (AR) does not contain substantial evidence to support the Commissioner's decision that she was not disabled during the relevant period of time. For the reasons discussed herein, the Commissioner's decision will be reversed and this case will be remanded for further proceedings.

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

Stout was born in 1960 and was 50 years old on the date last insured. She has a high school education and a limited work history, including jobs as a cashier, factory worker, nursing home cook and cleaner. She is married, with adult children and two grandchildren. Stout's impairments include degenerative disc disease of the lumbar spine with radiculopathy to the left leg, status post multiple surgeries.

Stout filed her application for DIB on June 14, 2011, alleging an onset date of on June 22, 2010. After her claim was denied initially and on reconsideration,

Administrative Law Judge (ALJ) Troy Silva conducted a hearing on January 7, 2013. The ALJ denied Stout's claim on January 25, 2013. Stout submitted a timely request review by the Appeals Council, which was denied on May 5, 2014.

Stout then filed a timely complaint (Doc. No. 3) in this court, seeking review of the Commissioner's decision. This case was assigned to Senior United States District Judge Donald E. O'Brien. On February 25, 2015, after this case had been fully briefed, Judge O'Brien held a hearing by telephone and took this matter under advisement. Unfortunately, Judge O'Brien passed away before issuing a ruling. This case was later reassigned to me after my appointment as a United States District Judge.

During the ALJ's hearing, Stout testified that she stopped working because of her sciatic nerve pain and that she has poor memory because of her medication. AR 43-44. She stated that she has lingering numbness in her foot, even after surgery, and only gets by due to the use of opioid pain medication such as morphine and Vicodin. *Id*. She testified that her lingering pain was at a level of three point five to four on a ten point scale. AR 48.

Stout testified that many activities, such as housework, cause her to have "flare-ups," meaning episodes of pain through her lower back. AR 46. She stated that when she has a "flare-up," she has to rest and put her feet up. *Id*. However, she regularly watches her two grandchildren on a full-time basis, five days a week. *Id*.

## II.  *DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF*

A disability is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), *accord* 1382c(a)(3)(A); 20 C.F.R. § 404.1505. A claimant has a disability when, due to his physical or mental impairments, the claimant "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any

other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). If the claimant is able to do work which exists in the national economy but is unemployed because of inability to get work, lack of opportunities in the local area, economic conditions, employer hiring practices or other factors, the ALJ will still find the claimant not disabled. 20 C.F.R. § 404.1566(c)(1)-(8).

To determine whether a claimant has a disability within the meaning of the Act, the Commissioner follows the five-step sequential evaluation process outlined in the regulations. *Id.* § 404.1520; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity (SGA), then the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(i). "Substantial" work activity involves physical or mental activities. "Gainful" activity is work done for pay or profit. 20 C.F.R. § 404.1572(a).

Second, if the claimant is not engaged in SGA, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 404.1520(c), 404.1521(a).

The ability to do basic work activities is defined as having "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling; (2) capacities for seeing, hearing and speaking; (3) understanding, carrying out and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting. *Id.* §

404.1521(b)(1)(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141 (1987). "The sequential evaluation process may be terminated at Step Two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will determine its medical severity. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled regardless of age, education and work experience. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity (RFC) and the demands of her past relevant work. If the claimant cannot do her past relevant work, then she is considered disabled. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(4). Past relevant work is any work the claimant has done in the 15 years prior to their application, that was substantial gainful activity and lasted long enough for the claimant to learn how to do it. *Id.* § 404.1560(b)(1). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); s*ee* 20 C.F.R. § 404.1545(a)(1). The claimant is responsible for providing the evidence the Commissioner will use to determine claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(a)(3). The Commissioner also will consider certain

non-medical evidence and other evidence listed in the regulations. *Id.* If a claimant retains enough RFC to perform past relevant work, then the claimant is not disabled. *Id.* § 404.1520(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his or her age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir. 2000). The Commissioner must show not only that the claimant's RFC will allow him to make the adjustment to other work, but also that other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 404.1520(a)(4)(v). If the claimant can make the adjustment, then the Commissioner will find the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(v). At Step Five, the Commissioner has the responsibility of developing the claimant's complete medical history before making a determination about the existence of a disability. *Id.* § 404.145(a)(3). The burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

If after these five steps the ALJ has determined the claimant is disabled, but there is medical evidence of substance use disorders, the ALJ must decide if that substance use is a contributing factor material to the determination of disability. 42 U.S.C. §§ 423(d)(2)(C). The ALJ must then evaluate the extent of the claimant's limitations without the substance use. *Id.* If the limitations would not be disabling, then the disorder is a contributing factor material to determining disability and the claimant is not disabled. 20 C.F.R. § 404.1535.

### III.   THE ALJ'S FINDINGS

The ALJ made the following findings:

(1)     The claimant last met the insured status requirements of the Social Security Act on September 30, 2011.

(2)     The claimant did not engage in substantial gainful activity during the period from her alleged onset date of June 22, 2010 through her date last insured of September 30, 2011.

(3)     Through the date last insured, the claimant had the following severe impairment: degenerative disc disease of the lumbar spine with radiculopathy status post multiple surgeries (20 C.F.R. § 404.1520(c)).

(4)     Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§§ 404.1520(d), 404.1525 and 404.1526).

(5)     Through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except she can lift and carry 20 pounds occasionally and 10 pounds frequently; she can stand and/or walk for 6 hours in an 8-hour workday; she can sit for 6 hours in an 8-hour workday; she can occasionally climb ramps and stairs; she cannot climb ladders, ropes, or scaffolds; she can occasionally bend, crouch, and crawl; and she cannot work in direct sunlight.

(6)     Through the date last insured, the claimant was unable to perform any past relevant work (20 C.F.R. § 404.1565).

(7)     The claimant was born on November 19, 1960 and was 50 years old, which is defined as a younger individual age 18-49, on the date last insured. The claimant subsequently changed age category to close approaching advanced age (20 CFR 404.1563).

(8)     The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

(9)     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

(10)    Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

(11)    The claimant was not under a disability, as defined in the Social Security Act, at any time from June 22, 2010, the alleged onset date, through September 30, 2011, the date last insured (20 CFR 404.1520(g).

AR 23-32.


## IV.     *THE SUBSTANTIAL EVIDENCE STANDARD*

The Commissioner's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Lewis*, 353 F.3d at 645. The Eighth Circuit Court of Appeals explains the standard as "something less than the weight of the evidence and [that] allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

In determining whether the Commissioner's decision meets this standard, the court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh

the evidence." *Wester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). The court considers both evidence that supports the Commissioner's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Sec'y of Health & Human Servs.*, 879 F.2d 441, 444 (8th Cir. 1989). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)). Nor does the court "review the factual record de novo." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson*, 30 F.3d at 939 (quoting *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984); *see Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.").

# V.    DISCUSSION

Stout contends that the ALJ's decision is not supported by substantial evidence because:  (a) the ALJ failed to fairly develop the record regarding Stout's post-surgical limitations; (b) the ALJ improperly relied on the opinion of the agency experts; (c) the ALJ improperly relied on Dr. Buchanan's opinion; and (d) the ALJ improperly discounted Stout's subjective complaints.

## A.    Development of the Record

### 1.    Applicable Standards

#### a.    Duty to Develop

"In deciding whether a claimant is disabled, the ALJ considers medical opinions along with 'the rest of the relevant evidence' in the record."  *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (quoting 20 C.F.R. § 404.1527(b)).  "Medical opinions" are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).  Other relevant evidence includes medical records, observations of treating physicians and others, and an individual's own description of his limitations. *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000). "Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a state agency medical . . . consultant."  20 C.F.R. § 416.927(e)(2)(ii).

In determining the severe impairments and crafting an RFC, the ALJ has a duty to develop the record fully and fairly, independent of the claimant's burden to press her case.  *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010); *see also Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004).  A social security hearing is a non-

adversarial proceeding, and the ALJ must develop the record so that "deserving claimants who apply for benefits receive justice." *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994). "[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." *Naber v. Shalala*, 22 F.3d 186, 189 (8th Cir. 1994). An ALJ "is not obliged 'to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability.'" *Gregg v. Barnhart*, 354 F.3d 710, 713 (8th Cir. 2003) (quoting *Pena v. Chater*, 76 F.3d 906, 909 (8th Cir. 1996)). "[R]eversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial." *Haley v. Massanari*, 258 F.3d 742, 750 (8th Cir. 2001). "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008) (citation omitted).

The obligation to obtain additional medical evidence comes from the ALJ's duty to develop the record. *See Snead*, 360 F.3d at 838 ("Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case."). "The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *Halverson v. Astrue*, 600 F.3d 922, 933 (8th Cir. 2010) (quoting *Barrett v. Shalala*, 38 F.3d 1019 (8th Cir. 1994)).

In determining the claimant's RFC, the ALJ may not normally rely solely on non-treating, non-examining sources. *See Nevland v. Apfel,* 204 F.3d 853, 858 (8th Cir. 2000), stating:

> The ALJ relied on the opinions of non-treating, non-examining physicians who reviewed the reports of the treating physicians to form an opinion of Nevland's RFC. In our opinion, this does not satisfy the ALJ's duty to fully and fairly develop the record. The opinions of doctors who have not

examined the claimant ordinarily do not constitute substantial evidence on the record as a whole.

However, the ALJ does not "have to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004) (citing *Snead*, 360 F.3d at 839). "The regulations do not require an ALJ to recontact a treating physician whose opinion is inherently contradictory or unreliable." *Hacker v. Barnhart*, 459 F.3d 934, 938 (8th Cir. 2006).

### b.    Medical Sources

*Acceptable Medical Source Opinions.*    Medical opinions can come from a treating source, an examining source or a non-treating, non-examining source (typically a state agency medical consultant who issues an opinion based on a review of medical records). Medical opinions from treating physicians are usually entitled to substantial weight. *Singh v. Apfel,* 222 F.3d 448, 452 (8th Cir. 2000). A treating physician's opinion "does not automatically control or obviate the need to evaluate the record as [a] whole." *Leckenby v. Astrue,* 487 F.3d 626, 632 (8th Cir. 2007). Nonetheless, if the ALJ finds that a treating physician's medical opinion as to the nature and severity of the claimant's impairment is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] record, [the ALJ] will give it controlling weight." 20 C.F.R. § 416.927(c)(2). "When an ALJ discounts a treating physician's opinion, he should give good reasons for doing so." *Brown v. Astrue,* 611 F.3d 941, 951–52 (8th Cir. 2010). However, a treating physician's conclusion that an applicant is "disabled" or "unable to work" addresses an issue that is reserved for the Commissioner and therefore is not a "medical opinion" that must be given controlling weight. *Ellis v. Barnhart,* 392 F.3d 988, 994 (8th Cir. 2005).

At the other end of the medical-opinion spectrum are opinions from non-treating, non-examining sources: "The opinions of non-treating practitioners who have attempted

to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole." *Shontos v. Barnhart,* 328 F.3d 418, 427 (8th Cir. 2003). This does not mean, however, that such opinions are to be disregarded. Indeed, "an ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence." *Prosch v. Apfel,* 201 F.3d 1010, 1014 (8th Cir. 2000) (internal quotations and citations omitted). Unless a treating source's opinion is given controlling weight, the ALJ "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant." 20 C.F.R. § 44.1527(e)(2)(ii).

In the middle of the spectrum are opinions from consultative examiners who are not treating sources but who examined the claimant for purposes of forming a medical opinion. Normally, the opinion of a one-time consultative examiner will not constitute substantial evidence, especially when contradicted by a treating physician's opinion. *Cantrell v. Apfel,* 231 F.3d 1104, 1107 (8th Cir. 2000).

Ultimately, it is the ALJ's duty to assess all medical opinions and determine the weight to be given these opinions. *See Finch,* 547 F.3d at 936 ("The ALJ is charged with the responsibility of resolving conflicts among medical opinions."); *Estes v. Barnhart,* 275 F.3d 722, 725 (8th Cir. 2002) ("[i]t is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'") (citing *Bentley v. Shalala,* 52 F.3d 784, 785–87 (8th Cir. 1995)).

*Other Medical Sources*. Under the regulations, a physician or a psychologist is an "acceptable medical source." 20 C.F.R. § 404.1513(a)(1)-(5). Only an acceptable medical source can establish the existence of a medically determinable impairment. 20 C.F.R. § 404.1513(a)(1)-(5). The Eighth Circuit has given explicit instruction regarding the weight given to other sources:

> [o]n August 9, 2006, the SSA issued Social Security Ruling (SSR) 06-03p, 71 Fed. Reg. 45,593 (Aug. 9, 2006). The ruling clarified how it

considers opinions from sources who are not what the agency terms "acceptable medical sources." Social Security separates information sources into two main groups: acceptable medical sources and other sources. It then divides other sources into two groups: medical sources and non-medical sources. 20 C.F.R. §§ 404.1502, 416.902 (2007). Acceptable medical sources include licensed physicians (medical or osteopathic doctors) and licensed or certified psychologists. 20 C.F.R. §§ 404.1513(a), 416.913(a) (2007). According to Social Security regulations, there are three major distinctions between acceptable medical sources and the others: (1) Only acceptable medical sources can provide evidence to establish the existence of a medically determinable impairment, *id.*, (2) only acceptable medical sources can provide medical opinions, 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) (2007), and (3) only acceptable medical sources can be considered treating sources, 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2007). Other sources: Medical sources include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists. Non-medical sources include school teachers and counselors, public and private social welfare agency personnel, rehabilitation counselors, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, clergy, and employers. 20 C.F.R. §§ 404.1513(d), 416.913(d) (2007). "Information from these 'other sources' cannot establish the existence of a medically determinable impairment," according to SSR 06-03p. "Instead, there must be evidence from an 'acceptable medical source' for this purpose. However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."

*Sloan v. Astrue*, 499 F.3d 883, 888 (8th Cir. 2007). The court went on to say: "In general, according to the ruling, the factors for considering opinion evidence include: [h]ow long the source has known and how frequently the source has seen the individual; [h]ow consistent the opinion is with other evidence; [t]he degree to which the source presents relevant evidence to support an opinion; [h]ow well the source explains the opinion; [w]hether the source has a specialty or area of expertise related to the individual's impairment(s); and [a]ny other factors that tend to support or refute the opinion." *Sloan*, 499 F.3d at 889. Finally, "[a] physical therapist is not an 'acceptable

medical source' whose opinion is entitled to substantial weight." *Castro v. Barnhart*, 119 F. App'x 840, 842 (8th Cir. 2005).

### 2.   *The Medical Evidence*

This case has a relatively limited medical record, mostly relating to Stout's back and leg pain.   The records begin in 2009, when Stout sought treatment with her chiropractor, John Schutz, D.C.   AR 557-68.   Dr. Schutz reviewed an MRI of Stout's lumbar spine on September 16, 2009, and diagnosed Stout with a disc herniation at L5-S1 that was causing moderate left neural foramen stenosis, which is compression of a nerve as it leaves a spinal canal through the foramen.   AR 555.   Failing to resolve Stout's pain, Dr. Schutz referred Stout to Robert Federhofer, D.O., in November of 2009.   AR 292.

Dr. Federhofer gave Stout a series of injections (AR 369, 292) which seemingly provided temporary relief.   In April 2010, Stout began seeing Roger Skierka, M.D., for her back pain.   AR 342-44.   Stout reported that she could only walk for a few minutes, could sit for only 30 minutes at a time and could not lift "much."   AR 343. Dr. Federhofer also referred Stout to Russell Buchanan, M.D., at Heartland Neurosurgery.[1]   At that clinic, Stout also saw Mary Ann Amend, ARNP, who noted on April 27, 2010, that Stout's pain began intensifying after she helped her parents move. AR 434.   Stout told Amend that her pain "goes on the left side, on the posterior aspect of her thigh and radiates down to her left ankle."   AR 434.

Dr. Buchanan scheduled Stout for back surgery on May 21, 2010, intending to relieve the pressure placed on the nerves exiting her spinal canal at L5-S1 and L4-5. AR 337, 372.   Dr. Buchanan performed a left-sided L4-5 laminotomy, medial facetectomy and decompression of the left L5 nerve root, along with a left-sided L3-4 laminectomy, neural foraminotomy, discectomy through the neural foramen, and

---

[1]  At every point from this date forward, Stout took a variety of pain medications and muscle relaxants.

decompression of the left L3 and L4 nerve root. AR 372. In the weeks following the surgery, Stout reported to Amend that she had no back pain and that her leg pain had improved significantly. AR 430. However, by September 2010, Stout reported some lower back pain and pain in her left leg. AR 422. Stout reported that the pain was severe enough that it affected her sleeping and her ability to stand for a period of time. *Id*.

On September 17, 2010, an MRI revealed a possible impingement on the left side at L3-4. AR 317. It also showed a "left-sided hemilaminectomy defect with some enhancing scar tissue" that slightly projected into the spinal canal at L4-5 and some mild left-sided neural foraminal encroachment from a bulging disc also at L4-5. *Id*. Stout told Dr. Buchanan in November 2010 that she continued to have some back pain. AR 418. He directed her to undergo a period of physical therapy. AR 418-21. Stout told Amend that the pain improved a few days later and that her back pain rated as "mild." AR 414.

Stout next treated for her back in April and May of 2011. Stout underwent a course of physical therapy from mid-April through early May. Stout attended several physical therapy sessions, where she often reported she was "doing fine" or "good." AR 300-02. She also reported times with zero back pain. *Id*. On May 2, 2011, physical therapist Michael Negen released Stout with the only limitation as "avoid back extension." AR 299. On May 31, 2011, Stout told Amend that she had stabbing low back pain. AR 410. She described the pain as relatively new, radiating from her low back to the left side of the front of her leg past her knee to her mid-thigh. AR 412. Amend ordered a new MRI, which revealed a moderate to severe impingement on the left neural foramen at L3-4. AR 412, 379. There was also mild impingement on the right neural foramen at L4-5 and moderate impingement of the left neural foramen at L4-5. *Id*.

Ashar Afzal, M.D., of the Allen Pain Clinic, saw Stout on June 3, 2011, and diagnosed her with L4 radicular pain. AR 310. Dr. Afzal noted that Stout's pain was

so severe she could not put weight on her leg and that she had recently been treated at an emergency room for it. *Id.* He performed a selective nerve root injection around the L4 nerve to see if it would provide relief and provided her pain medication. *Id.* On June 8, 2011, Daniel Koos, M.D., noted Stout's pain was not well-controlled and the injection had not helped her. AR 359. However, he stated that she had a normal range of motion at all joints, no vertebral tenderness, and a positive straight leg raise. *Id.* Dr. Koos noted that Stout was considering seeking social security disability, but did not opine regarding whether she had any specific limitations. AR 360.

Stout followed up with Amend again on June 9, 2011. AR 406. She reported that her pain was worse, that she was using a wheelchair and that she had back spasms throughout the day. AR 408-09. Amend diagnosed lumber disc disorder with myelopathy and degeneration of the lumbar or lumbosacral disc. *Id.* Amend noted that medication and injections had not relieved the pain and recommended another surgical intervention. *Id.*

On June 15, 2011, Dr. Buchanan performed surgery to address Stout's left L3 radiculopathy issues. AR 323. He performed the procedure to decompress the L3 nerve root by doing a total facet removal at L3-4, which also decompressed the L4 nerve root at that level. *Id.* Dr. Buchanan also attempted to perform a fusion at L3-4.[2]

Stout's first post-operative follow-up on July 11, 2011, noted that she was much improved after treatment and that she had no pain down her leg. AR 455, 458. However, Lynn Galloway, P.A., (who works at the same clinic as nurse Amend and Dr. Buchanan) stated Stout should avoid prolonged bending, stooping, or heavy lifting and other activities that aggravate back pain. AR 457. Galloway recommended working up to 30 minutes of walking a day and a course of physical therapy. *Id.* Galloway also noted that Stout continued to experience some mild to moderate back pain. AR 458.

---

[2] There is some confusion in the record as to whether the fusion was at L4-5 or L3-4. Most records say L4-5.

On August 15, 2011, Galloway stated that Stout was "much improved." AR 467. Galloway's recommendations were unchanged from the July appointment. AR 469-70. However, Galloway wrote:

> [Stout] has been off work for a year now since before her first surgery. She states she is still unable to do anything even walk around Walmart because she has no strength to do so. She has not been exercising and I stressed the importance of exercise including daily walking and daily core strengthening. She did not start [physical therapy] after her last visit as instructed because she was afraid. I discussed with her that if she does not start exercising now she will never be able to do anything. She will start [physical therapy] for leg strengthening and we can build from there. She certainly would be unable at this point to return to work as a store clerk as she is limited to 25 pounds lifting and would at this point be unable to do any prolonged standing or walking. We will check her back two months.

AR 470.

On December 15, 2011, Galloway examined Stout and recorded that her pain had increased. AR 476. Galloway's notations on this date are short, but Galloway did record that x-rays revealed no sign of post-surgical hardware failure. AR 477. Galloway also stated that Stout should not lift more than 20 pounds and should alternate sitting and standing every 45 minutes. AR 478. Galloway noted that Stout continued to care for her two young grandchildren throughout the day. AR 475.

On January 12, 2012, physical therapist William Taylor examined Stout. He noted that Stout was "very active at home and cares for two grandchildren five days a week. Picking up her 20 lb grandchild and doing vacuuming, sweeping, stooping, bending, etc. increases low back pain." AR 480. Stout reported increased back pain and was limited in going through various lift exercises. *Id*. Taylor stated that "she does not seem to be on a solid group of exercise of core strengthening and I would recommend this." *Id*. Taylor also made detailed limitation findings. AR 483.

On March 4, 2012, Stout went to the emergency room with lumbar spasms. AR 528. She stated she had worsening pain in both her back and her leg. AR 523. The

pain radiated down "the posterior aspect of the hip and radiate[d] to the foot." *Id*. A CT scan read March 5, 2012, by Hameed Kahn, M.D., showed issues at the L4-5 level possibly caused by postoperative changes and bilateral neural foraminal narrowing at the L5-S1 level, greater on the left than the right. AR 534. On March 6, 2012, Amend noted that Stout's pain had increased. AR 488. She again encouraged Stout to take up walking and an exercise routine. AR 490. She also recommended Stout avoid activities that aggravate her back. *Id*. She directed Stout to get another steroid injection. AR 491.

By April 3, 2012, Stout reported that her pain had reached 10 out of 10. AR 499. The pain radiated down her "left buttock; and to the posterior aspect of the left hip and lateral aspect of the left hip; lateral aspect of the thigh; and lateral aspect of the left ankle[,] pain is increased in ankle since the last visit." *Id*. Amend recommended a follow up with Dr. Buchanan. AR 502. On April 22 and 23, 2012, Stout visited the emergency room after driving several hours and experiencing back pain and spasms. AR 516. Cristina Pasarin, M.D., noted Stout had left L5 radiculopathy, along with a history of left L3 and L5 radiculopathy. AR 517. Dr. Pasarin recommended further testing to evaluate possible degeneration in Stout's back. *Id*.

An MRI on April 24, 2012, showed post-operative changes at L5-S1 on the left that appeared to cause pressure on the S1 and L5 nerve roots. AR 532. On April 25, 2012, Dr. Buchanan performed a redo lumbar disk herniation procedure at L5-S1 that had originally been performed in 2010. AR 509. Dr. Buchanan noted "[s]ignificant compression of the left S1 nerve root...." *Id*. Dr. Buchanan exposed a previous laminotomy defect during the procedure and cleared tissue and dissected the scar tissue away from the bone edge to perform decompression at the S1 level. AR 510.

On May 17, 2012, Stout again saw Amend. AR 495. Amend noted slight improvement in Stout's pains and made similar recommendations as after previous surgeries (exercise and walking, etc.) but stated that Stout should proceed without physical therapy, as "this has always caused more harm than good." AR 497. Amend

also limited Stout's activities (bending, stooping, etc.), noted that she should avoid sports for three months and stated that Stout was unable to work. AR 497-98.

### 3. The ALJ's Findings

As set out above, the ALJ found that Stout had the RFC to perform light work except she can only lift and carry 20 pounds occasionally and 10 pounds frequently; she can stand and walk for six hours in a workday; she can sit for six hours in an eight hour workday; she can occasionally climb ramps and stairs; she cannot climb ladders, ropes, or scaffolds; she can occasionally bend, crouch, and crawl; and she cannot work in direct sunlight. In making these findings, the ALJ gave great weight to the opinions of physician's assistant Galloway, physical therapist Taylor and the agency sources. The ALJ also found:

> Ms. Galloway's opinion that the claimant should alternate sitting and standing 45 minutes per hour is not given significant weight since it is not supported by the diagnostic or clinical findings and not recommended by any other medical source (Ex. 13F, p. 4). The claimant's nurse practitioner and her neurosurgeon issued a restriction in July 2010 and September 2010, respectively, for the claimant not to lift more than 25 pounds (Exs. 4F, p. 10 and 6F, p. 22). In light of the claimant's continued complaints of pain and reported difficulty lifting her youngest grandchild who weighs less than 25 pounds as of December 2011, I have found the 20-pound lifting limit more adequately accommodates the claimant's difficulties due to her impairment (Ex. 13F, pp. 2, 4).

AR 29.

### 4. Analysis

Stout argues that ALJ had a duty to develop the record regarding Stout's capacity to work following her surgeries. Specifically, Stout argues:

> The ALJ did not note any functional limitations or restrictions imposed by Dr. Buchanan after [her] 2011 surgery—the surgeon that performed her three back surgeries and otherwise managed her back treatment in the record. (See *TR 27). Dr. Buchanan's treatment notes were mostly terse

summaries of individual treatment sessions. (See *TR 333, 418, 332).
He did note that in 2010 Stout could return to work with a 25-pound
lifting restriction (*TR 424), but the record does not contain any opinion
from Dr. Buchanan as to what functional limitations Stout had after her
2011 back surgery. By *Nevland* and its progeny, the ALJ's decision as it
relates to Stout's residual functional capacity after her June 15, 2011,
back surgery is not based on substantial evidence because the RFC was
determined without reference to any treating or examining doctor's
opinion.

Doc. No. 10 at 18. Stout also argues:

The opinions of Dr. Gershe and Dr. Hunter, non-examining agency file
reviewers, relied on the premise that the fusion performed to Stout's
lower back in 2011 was performed at the L3-4 level as described in Dr.
Buchanan's June 15, 2011, operative report. (*TR 82 ("06-15-11 left
laminectomy with posterior lateral fusion L3-4 and posterior lateral
internal fixation L3-4 performed"), 471 ("prior assessment affirmed as
written"), 323 (operative note—laminectomy, decompression and PLIF at
L3-L4)). Objective CT and MRI scans have since shown that this
underlying premise was probably false. (*TR 532, 534 (indicating fusion
was at L4-5 level)). The MRI and Dr. Buchanan's own notes from his
2012 redo surgery seem to indicate that the 2010 back surgical procedures
he purportedly performed at the L3-4-5 levels were actually performed at
the L4-5-S1 levels. (*See* *TR 372, 532 ("Post operative changes at L5-
S1 on the left", 509 ("Lumbar disk herniation, left side L5-S1. This is a
redo disk herniation. The first surgery was in 2010")). As a result, the
reviewers did not anticipate a third surgery, but anticipated the claimant
could return to work.

Doc. No. 10 at 19. Accordingly, "the limitations proposed by Dr. Gershe and affirmed
by Dr. Hunter cannot constitute substantial evidence supporting the ALJ's RFC
determination." Doc. No. 10 at 20.

Finally, Stout concedes that Dr. Buchanan gave Stout a 25-pound lifting
restriction after her 2010 surgery, and he anticipated she would return to work within
12 months. However, Stout states:

Dr. Buchanan's opinion as to Stout's restrictions from September 13,
2010, until some point before her June 15, 2011, surgery was
"inconsistent with the other substantial evidence" in the record—mainly

20

Stout's subjective complaints, Ms. Amend's later restrictions, and the apparent fact that the 2010 back operation was performed at the wrong level. See 20 C.F.R. § 404.1527(c)(2). Dr. Buchanan has not provided an opinion as to whether the 25-pound lifting restriction was correct given that Stout needed further surgery in 2011 and also given what he found out shortly before the 2012 procedure—that he had apparently performed the 2010 surgery at the wrong levels in 2010. . .

Doc. No. 10 at 21-22.

Stout's argument, in short, is that Dr. Buchanan was in the best position to consider and opine regarding Stout's post-surgical limitations. Stout argues that because Dr. Buchanan did not make extensive findings in his treatment notes, the ALJ had a duty to seek an opinion regarding Stout's limitations during the applicable time period (between the alleged onset date on June 22, 2010 and the date last insured, September 30, 2011). The defendant disagrees and argues that the ALJ's decision is supported by substantial evidence.

At the outset, I note that while Stout spends a considerable amount of time discussing whether Dr. Buchanan operated at the L3-4 level or the L4-5 level in 2010, that issue is not particularly relevant to my analysis. There is no evidence suggesting that the specific level at which Dr. Buchanan operated has any effect on the case. Even if Dr. Buchanan's notes misstate the location of the surgery, the ALJ's RFC is (or at least should be) based on Stout's ability to function and her limitations, not the precise type of back surgery Dr. Buchanan performed.

Stout's better argument is that the three surgeries should be viewed as an ongoing issue; that the first surgery begat the second surgery which begat the third surgery while the original issue left unaddressed by the first surgery continued to cause Stout's deterioration. However, even that argument misses the mark, because, as the Commissioner points out, this court's inquiry is related to a particular period of time. The question is whether the ALJ's RFC reflects Stout's abilities as they existed between June 22, 2010, and September 30, 2011.

Based on my review of the record, I find that the ALJ failed to properly develop the record regarding Stout's limitations during the relevant period. *Nevland* and its progeny require that an ALJ develop the record if a critical issue is left underdeveloped and make it clear that the ALJ may not rely on non-treating, non-examining sources to fill in "holes" in the record. *See, e.g., Hattig v. Colvin*, No. C12-4092-MWB, 2013 WL 6511866, at *10 (N.D. Iowa Dec. 12, 2013). Here, Stout had an ongoing issue with back/leg pain during the relevant time period. She had surgery in 2010 and, while she initially reported some relief, her pain returned shortly thereafter. She was prescribed a course of physical therapy, completed it and was released to somewhat normal activity, but her condition then worsened. She then had a second surgery in 2011 and again reported some relief, but her pain again returned and she subsequently required a third surgery.

Dr. Buchanan's post-surgical records in 2010 reflect his belief that Stout was in the process of improving post-surgery. *See, e.g.,* AR 418-25. However, Stout reported increased pain, falling and decreased functioning shortly thereafter. *See* AR 299-302, 359. Indeed, after completing physical therapy and returning to normal activity, her condition quickly deteriorated and she had a second surgery. Thus, although the record contains evidence of both post-surgical limitations and what the doctors thought Stout's limitations would be when they assumed that the 2010/2011 surgeries were successful, the record contains no medical opinions about what Stout's impairments *actually were* during that time period in light of the fact that neither surgery actually resolved Stout's issues.

The ALJ relied primarily on two facts in support of the RFC: (1) Stout cared for her grandchildren and (2) for short time period following the 2011 surgery, Stout reported improvement. The operative portion of the ALJ's opinion states:

> As for the opinion evidence, I have given significant weight to the opinion of the claimant's physician's assistant, Ms. Galloway, who opined in December 2011 that the claimant should not frequently lift over 20 pounds (Ex. 13F, p. 4). Significant weight is also given to the opinion of the

claimant's physical therapist, William M. Taylor, from January 2012 indicating that the claimant can occasionally perform postural activities but not climb heights, could lift 20 pounds occasionally and 10 pounds frequently, and has no limitation with sitting, standing, and walking in an 8-hour day (Ex. 14F, pp. 2-5). Although a physician's assistant and physical therapist are not acceptable medical sources, they are medical sources and they have examined the claimant over a significant period and the objective findings from physical examination, radiographic reports, and the claimant's ability to perform numerous activities of daily living support their opinions. Although these limitations were assessed prior to the claimant's final surgery in April 2012, there is no medical evidence of record regarding the claimant's treatment and limitations for her back and leg pain after this most recent procedure (Ex. 19F). In addition, the claimant's date last insured is September 30, 2011; thus, any possible evidence of deteriorating conditions after the date last insured is not within the relevant time period. Furthermore, it is reasonable to expect that the claimant's condition improved after this last surgery as it had after the second surgery and she can actually perform at a less limited level than the physician assistant and physical therapist had assessed a few months prior to her surgery. The claimant's continued care for two small children also indicates she could reasonably function at the residual functional capacity assessed herein. In giving the claimant's subjective complaints the benefit of the doubt and in consideration of the combined effects of the claimant's severe and nonsevere impairments on the claimant's ability to ambulate as well as her other body systems, I find that the less than light exertional and function-by-function limitations delineated above is appropriately the most the claimant could do.

AR 28-29 [emphasis added]. Based on this explanation, it is clear that the crux of the ALJ's finding is not based on any medical evidence of record during the relevant time period. Instead, the ALJ relied on a post-relevant time period functional capacity report done between Stout's surgeries and an assumption that "it is reasonable to expect that the claimant's condition improved" after surgery. But, as the ALJ admits, "the claimant's date last insured is September 30, 2011; thus, any possible evidence of deteriorating conditions after the date last insured is not within the relevant time period."

There simply is no medical evidence from an acceptable medical source that explains Stout's condition during 2010/2011, when it is clear that neither of the surgeries that occurred during that time period provided lasting improvement.[3] Additionally, although the ALJ leans heavily on the fact that Stout took care of her grandchildren, that fact alone is not sufficient to supplant medical evidence in the formation of the RFC when, as in this case, the claimant has a documented severe impairment. Put another way, the subsequent developments in Stout's case indicate that Dr. Buchanan was incorrect in his initial assessment that Stout was improving post-surgery in 2010/2011. The medical evidence from this time period (including Dr. Buchanan's notes, P.A. Galloway's assessments, physical therapy notes, and state agency consultants opinions) seem to have been based on this faulty assumption. An accurate picture of Stout's condition in 2010/2011 cannot be drawn from medical records that are premised on an incorrect assumption. Instead, some medical evidence must be obtained that incorporates Stout's subsequent history and answers the question of "given that history, what was Stout's condition during the relevant time period?" Because no such evidence exists in this record, the ALJ's RFC is not supported by

---

[3] The ALJ as much as admitted this by basing the RFC on the opinions of physician's assistant Galloway, physical therapist Taylor and the state agency sources. As set out above, neither a physicians' assistant nor a physical therapist constitute an acceptable medical source. Of course, they can be considered 'other' sources for determining the extent of a claimant's impairments. However, in this case those opinions are not reliable under the *Sloan* [499 F.3d at 888] factors because they are not adequately explained and – because no other medical evidence exists for the relevant time period – they are not consistent with the primary medical evidence regarding Stout's limitations. The ALJ's reliance on the state agency experts is equally misplaced. The ALJ noted that the state agency consultant opinions were credible because they relied on the claimant's "trend of improvement after surgery" and "longitudinal treatment notes." However, no treatment notes from the relevant time period exist that actually reflect the failure of the surgeries, and the term "trend of improvement" completely misstates the record. Stout improved for a short while, and then declined. Accordingly, the ALJ's reliance on these opinions, in the absence of a more fully developed medical record, is misplaced.

substantial evidence.  Remand is necessary for the ALJ to adequately develop the medical record regarding Stout's limitations during the relevant time period.

**B.**    *Credibility*

Stout argues that the ALJ failed to properly consider her subjective complaints. Among other things, she contends that the ALJ improperly relied on her activities of daily living, specifically regarding the care she provides to her grandchildren, to discount her subjective complaints of disability (and the third party statements of her husband).  Because I have concluded that remand is necessary for further development of the medical record, the ALJ is directed to reevaluate the credibility of Stout's statements and her husband's statements in light of the newly-developed medical record.

## VI.    CONCLUSION

For the reasons set forth herein:

1.    The Commissioner's determination that Stout was not disabled is **reversed** and this matter is **remanded** to the Commissioner for further proceedings consistent with this opinion.

2.    Judgment shall enter against the Commissioner and in favor of Stout.

3.    If Stout wishes to request an award of attorney's fees and costs under the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412, an application may be filed up until 30 days after the judgment becomes "not appealable," i.e., 30 days after the 60-day time for appeal has ended.  *See Shalala v. Schaefer*, 509 U.S. 292, 296 (1993); 28 U.S.C. §§ 2412(d)(1)(B), (d)(2)(G).

**IT IS SO ORDERED.**

**DATED** this 19th day of August, 2016.

_____
LEONARD T. STRAND
UNITED STATES DISTRICT JUDGE